### A92A2072. SCOTT v. THE STATE.
(427 SE2d 537)

BLACKBURN, Judge.

Charles Scott was convicted by a jury of two counts of sale of cocaine. He appeals, contending that the trial court erred by allowing the prosecution to place his character in evidence and that the evidence was insufficient to support the verdict.

The sales of cocaine occurred on October 23 and 31, 1989. Scott lived in a duplex apartment at 3363 Antioch Road, Macon, Georgia. Two members of the Bibb County Sheriff's Department, an undercover agent, Deputy Lee Deal, and his supervisor, Investigator Russell Nelson, testified against Scott. Nelson and Deal testified that they had "targeted" Scott for a possible drug buy. Deal testified that before the first sale, "I had been working in the area where Mr. Scott lives in and I had seen him and heard conversations from other individuals in the area, who he was. . . . Everyone in the area called him Bay Charles." According to Deal, he bought crack cocaine from Scott at the latter's apartment on October 23, 1989, and October 31, 1989, each time paying him $40. Deal said that during each buy he entered Scott's apartment and waited in the living room while Scott went to another part of the apartment and got the cocaine, and that he was in Scott's apartment "[l]ess than one minute on each buy." According to Nelson, he did not observe Deal go into Scott's apartment on either occasion, but on each occasion Deal returned from Scott's apartment with cocaine, which Deal turned over to Nelson. After each buy Deal told Nelson he had bought the cocaine from the defendant. On the day after the first buy, Nelson showed Deal a photo lineup with Scott's picture in it, and Deal identified Scott as the person from whom he had bought the cocaine. A forensic chemist testified that the material Deal had bought from Scott tested "positive for cocaine." Scott was arrested in April 1990 and was tried and convicted in June 1990.

During his testimony at trial, Scott was asked whether he was known as "Bay Charles," and he replied that he was known as "Baby Charles." Scott testified that he had not sold any cocaine to Deal, that Deal had never been to his apartment, and that he had never seen Deal before the trial of the present case.

1. In his first enumeration Scott asserts that the court improperly permitted the prosecution to introduce evidence of his general character. In the course of his argument in support of this enumeration he raises three distinct contentions, each concerning the introduction of

testimony that he contends impermissibly placed his character in issue. As of the dates of the drug buys, Scott was on probation as a first offender for the felony of possession of marijuana. The testimony in question consists of a reference by Nelson to a computer check of probation, a reference by Deal to a computer check of a "jail file," and testimony by Scott's probation officer.

The opening statements of counsel were not included in the record, but it appears from statements by the trial court and Scott's trial counsel, Thomas H. Hinson, during the trial that during Hinson's opening statement he raised questions concerning the address of Scott's apartment.

There was undisputed evidence that the address numbers had been removed from the outside of Scott's apartment. According to Nelson, "[w]e find that people will remove the numbers from the house to try to throw us off when we go on a search warrant." Scott testified that the numbers were not on his apartment when he moved there, and had never been there in the one-and-one-half years he had lived there.

Nelson described the location of the apartment as "the first duplex apartment to your right as you turn into the driveway off of Antioch Road. If you're facing the apartment from the front, it would be the apartment on the right." Deal described the apartment's location similarly. He "believe[d] there's six buildings" in Scott's apartment complex, although he had "never stopped and counted them" and was "not sure." Scott testified that there were five buildings in the complex.

During the state's direct examination of Nelson, the prosecutor asked him "at some point during your investigation, . . . did you attempt to get an address of this location that we're talking about?" Nelson answered that he had, and then was asked "[h]ow did you attempt to get that address?" He responded that *I checked the computer, checked on the probation by —*" (emphasis supplied), at which point his answer was interrupted by a request by defense counsel for a bench conference. At the conference, the following colloquy took place: "THE COURT: You have brought into issue the address. He has a right to testify how he — the only way he could get an address. MR. HINSON [defense counsel]: I think the state could use some other way to bring it out, other than bring it out this way. MS. [KIMBERLY] SHUMATE [prosecutor]: I'm not going to ask him anything more. THE COURT: *The only way they can do it is how it was done, isn't it?* MR. HINSON: *Yes, sir.*" (Emphasis supplied.)

The bench conference then ended, and Shumate asked Nelson, "[w]hen you checked your computer program, Officer Nelson, did you get an address?" Nelson replied that he had gotten "3334 Antioch Road," which he had written on a report, but that he had since

learned that the correct address was "3363 Antioch Road."

On cross-examination of Nelson, Hinson asked him, "[n]ow, you know that there's a city map with everybody's house number on it on file in the courthouse don't you?" Nelson replied that he was not aware of such a map. Hinson later asked him whether he had looked Scott's address up on any map, to which Nelson replied that "I checked the blue book for an address and there wasn't one listed." Hinson then questioned Nelson about several reports which Nelson and Deal had filled out, and which contained no address number or an incorrect address number for Scott's apartment. Hinson completed his cross-examination with this dialogue: "What you're telling the jury is that you got *some information from a computer* that this man over here, Charles Scott, the person that you were targeting, lived on Antioch Road? A. I knew he lived on Antioch Road. Q. At a certain address? A. I knew he lived on Antioch Road. Because the numbers were removed from the house, I didn't have no way of determining what the number was so I had to use information that he gave what his address was."

Nelson also testified on cross-examination that Deal had written "482 Antioch Road," "480 Antioch Road," and "42 Antioch Road" on various documents. An overnight recess was taken after Nelson's testimony.

At the beginning of the next day's proceedings, Hinson moved for a mistrial on the ground that the state had put Scott's character in issue when Nelson testified that he had gotten Scott's address through a computer check of "probation." The following colloquy then ensued: "THE COURT: I'm going to overrule it *because it was brought up in opening arguments the question of differences in addresses* and I think the state had a right to show how they got the address. MR. HINSON: All right. But what I'm saying, Your Honor, is that, and I'm not arguing with your ruling, I'm understanding it very clearly, but what I'm saying is I think the state could have done it in a different way. They could have said they just simply checked the computer, without referring to the probation computer or any type of jail computer or anything like that. THE COURT: The state did not say that. The witness mentioned the word "probation" and it was never mentioned again and I barely heard it and I don't know if the jury even heard it because it was almost an in passing thing, said I checked the computer and probation or something like that and then Ms. Shumate immediately went to something else and the word 'probation' never came up again. MR. HINSON: I understand that. *That's really why I did not make the objection at that particular moment.* I wanted to point out to the Court that I think using the word 'probation' did place his character in issue and I would like to ask — THE COURT: The Court is of the opinion that the state, if it

wanted to, could bring in a probation officer and they could testif[y] that they interviewed, if this were the fact, that they interviewed this man and he gave them a certain address and that this is the address that he was given in his official capacity in interviewing this individual and that that is the address that was then put on the computer as his address. I think they could do that and I don't anticipate that they're going to, but the fact of the defense I think means that they have a right to show what address they have on him and how they got it and who secured it. So it's a situation where by raising a particular defense the state has to meet it the best way they can and if they can only meet it in such a way that it incidentally puts the person's character in issue, I think that that is not grounds for a mistrial. The same would be true if somebody raised an entrapment defense. They would then have a right to go in and show everything that they had, innuendo, reports concerning a person's background, convictions, all of this sort of thing in order to show a propensity to commit the offenses. I think it's the same sort of situation. MR. HINSON: Well, I understand what the Court's saying and I agree with the logic behind it, but I think that the state could have kept that word 'probation' from being offered. There was absolutely no need in it and it certainly didn't do anything except place his character in issue. MS. SHUMATE: Except that the part of the defense that's been raised here is not just the difference in addresses but that the police were doing sloppy police work in not investigating this properly and not looking at the city plat map or whatever. THE COURT: I've made my ruling and I've made my record. MR. HINSON: Thank you, Your Honor." (Emphasis supplied.)

During direct examination of Deal, that witness gave the following testimony: "Q. Investigator Deal, when you went back to the drug squad office that night [after the first buy], did you know a house address? A. No, ma'am, I did not know the address. Q. Did you know a street? A. I knew it was Antioch Road. Q. Did you make some attempt to find a street address? A. Yes, ma'am, I did. Q. What attempt did you make? How did you do that? A. I pulled up Mr. Scott's name *on a computer.* Q. Now, do you know — *Were you looking at the same computer that Investigator Nelson looked at*? A. No, ma'am, it was *a different code. I looked at a different code.* Q. Different program? A. *Different program.*" (Emphasis supplied.) When asked whether he had gotten an address, he said he had gotten "482 Antioch Road," which he had since learned was an incorrect address.

On cross-examination, Deal was asked by Hinson whether he had ever worked the computer "on the front desk there at the jail where people come in and post bonds and that sort of thing" (emphasis supplied), to which Deal replied in the negative. Later in his questioning, Hinson asked whether he knew where Nelson had gotten the address

"3334 Antioch Road," to which Deal replied affirmatively. Hinson then asked, "[h]e went to a computer also; is that right," and Deal replied, "[y]es sir, same terminal." Hinson subsequently questioned Deal about the various addresses, including 482 and 480 Antioch Road, that had been written on documents in connection with the case.

On redirect examination the following exchange took place: "Q. Investigator Deal, let's back up to one of the first things that Mr. Hinson asked you about. He asked you about the property bond computer and that sort of thing. That's not the program you looked at, is it? A. No, it's not. Q. When you punched something in the computer to get this 482 address that you got, what were you asking for? Were you asking for an address or a name or what? MR. HINSON: Your Honor, I would ask that he not be allowed to answer that question. THE COURT: Are you withdrawing your attack on the fact that there's various numbers involved? MR. HINSON: No, sir. THE COURT: All right. Answer the question. A. THE WITNESS: I had a name and I just — *There's various codes you can put in and then with the name afterwards, I just put in the jail file.*" Q. You put in his name and got an address; is that correct? MR. HINSON: Your Honor, I object. THE COURT: Over[r]uled." (Emphasis supplied.)

After the state rested, Scott renewed his earlier motion for mistrial, and also moved for a mistrial "on the basis of the officer who got my client's name on the jail list. I [don't?] think that that was necessary. I think it, obviously, placed his character in issue. I think the state had, frankly the prosecuting attorney, I think had done as much as she could do to protect his character from being put into issue in her direct examination. I don't want to give up any points, but I think she did everything she could, but then she went back on redirect and got into an issue that I felt like he was going to go into and that is this jail list. So we've got one witness testifying that his name's on the probation list and another witness testifying that his name's on a jail list or jail computer and I just think that, obviously, put into issue his character and we had not heretofore placed his character in issue."

The trial court replied that "I certainly did not anticipate that phrase coming out and I don't think the question required that. I'm disappointed in the fact that it happened. I am not going to declare a mistrial. *If you would submit to me a proposed charge regarding that, I will be happy to give the appropriate charge to the jury.*" (Emphasis supplied.) Hinson replied that "[o]f course, that puts me on the horns of a dilemma. *I don't want to emphasize that point with the jury, and I think to charge that would cause that point to be unduly emphasized.*" (Emphasis supplied.) The trial court responded that "[t]hat is your option. So I'll overrule your motion."

On recross-examination of Scott, he denied ever having lived at

3334, 482 or 480 Antioch Road, and further denied ever having told anybody that he lived at 3334 or 482 Antioch Road.

After the defense rested, the state called Mozelle Gholson as a rebuttal witness. She testified that she was an employee of the Macon Probation Office, and replied affirmatively when asked if in the course of her work she had "come in contact with" Scott "on more than one occasion." During her testimony on direct and cross-examination she testified that "each time" he came in the office it was "always standard procedure" to ask about his address. Gholson at first maintained that he "consistently" and "always" had given her 3334 Antioch Road as his address, but she later admitted that on at least one occasion he had told her that he lived at 3363 Antioch Road. She also said that he had never told her that he lived at 480 or 482 Antioch Road.

After her testimony, Hinson addressed the trial court as follows: "Your Honor, I wanted to renew the previous two motions for mistrial and also make an additional motion. I had previously objected at the bench or indicated that I wanted to object. The Court advised me you wanted me to wait until the jury left — THE COURT: That's correct. MR. HINSON: — on the testimony of Mrs. Gholson. I believe her testimony has placed his character at issue and I would, therefore, request the Court grant a mistrial. THE COURT: We'll let it go to the jury."

(a) Scott's initial contention with respect to his first enumeration of error is that the trial court erred by not granting his motion for mistrial that was based on Nelson's reference to the probation computer. However, the record shows that at two points Scott's counsel failed to object contemporaneously to the court's ruling allowing the testimony: First, during the bench conference after Nelson made the reference, the court asked, "[t]he only way they can do it is how it was done, isn't it," and Hinson replied, "Yes, sir," thereby acquiescing in the court's ruling. Second, during his motion for mistrial on the following day Hinson acknowledged that "I did not make the objection at that particular moment," referring to the bench conference the previous day. Although Scott moved for a mistrial based on Nelson's reference to the probation computer, Scott's "failure to object contemporaneously constitutes a waiver. [Cit.]" *Merritt v. State*, 255 Ga. 459, 460 (2) (339 SE2d 594) (1986). Accord *Smith v. State*, 180 Ga. App. 422, 423-424 (1) (349 SE2d 279) (1986).

(b) Scott's second contention in support of his first enumeration is that the trial court erred by failing to grant his motion for mistrial that was based on Deal's testimony that he searched for Scott's address in the "jail file."

We find that this contention presents nothing for our review, since the record shows that Scott declined the trial court's offer to give curative instructions. After expressing its displeasure with Deal's

reference to the jail file, the court said, "[i]f you would submit to me a proposed charge regarding that, I will be happy to give the appropriate charge to the jury." Hinson declined the offer, explaining that "[o]f course, that puts me on the horns of a dilemma. I don't want to emphasize that point with the jury, and I think to charge that would cause that point to be unduly emphasized." The trial court acknowledged his decision not to accept the court's offer, informing Hinson that "[t]hat is your option. So I'll overrule your motion." We hold that "[s]ince defense counsel declined the trial court's offer to give curative instructions to the jury, appellant will not now be heard to complain." *Jones v. State*, 250 Ga. 166, 168 (3) (296 SE2d 598) (1982). Accord *Tyler v. State*, 198 Ga. App. 685, 687 (1) (402 SE2d 780) (1991).

(c) Scott's third contention regarding his first enumeration of error is that the trial court erred by failing to grant his motion for mistrial that was based on Gholson's testimony. He contends that her testimony improperly placed his character in evidence by revealing that he had a prior criminal conviction. We find that this contention has no merit.

The testimony in question did tend to impugn Scott's character, but relevant evidence is not rendered inadmissible merely because it incidentally impugns the defendant's character. *Rhodes v. State*, 200 Ga. App. 193, 197-198 (5) (407 SE2d 442) (1991) (travel permit issued by probation office was admissible because it was necessary to link defendant with other evidence); *Miller v. State*, 163 Ga. App. 889, 890-891 (3) (296 SE2d 182) (1982) (testimony by GBI agent about visits to defendant's house on pending undercover investigation was material to issue of location of appellant's house).

Scott's defense was mistaken identity, and in support of this defense he attempted to show, through the confusion over the exact address of his apartment, that Deal was mistaken about the location of his purchases, and therefore that Deal had bought the cocaine at someone else's apartment. We find that Scott thereby made the location of the sales a material issue, and that the trial court did not err by permitting the state to explain a source of the investigating officers' confusion over the address of Scott's apartment, even though such evidence incidentally impugned Scott's character.

2. In his second enumeration of error Scott contends that the trial court erred by permitting testimony about an alleged independent buy from a woman who allegedly lived with him. For the following reasons, we find that this enumeration has no merit, as the testimony was relevant to the question of Deal's identification of Scott.

On cross-examination of Deal, he was asked by Hinson whether he knew "how many people were living in the apartments [sic] you went into?" Deal responded, "I know for a fact, two." On redirect

examination, Shumate questioned him as follows: "Q. You worked several different locations on Antioch Road; is that correct? A. No, ma'am. On Antioch Road itself, I worked Mr. Scott's house and the area right on the side. There's several people that sit on a hill there. Q. So you didn't work various apartments on Antioch Road? A. No, ma'am, just that one apartment. Q. Just that one particular apartment? A. Yes. Q. And you had made other cases in the front yard? A. Several; numerous. Q. Did you ever make a case on a female? A. I did. Q. Okay, and do you know who that female was? MR. HINSON: Your Honor, I object. I don't know what that has to do with this case. THE COURT: I don't either, but let's find out. Answer the question. MS. SHUMATE: May we approach? *Bench Conference.* MS. SHUMATE: The question is it's his girlfriend. MR. HINSON: That hasn't got anything to do with this case. THE COURT: I don't know whether it does or not. *Conclusion of Bench Conference.* THE COURT: Answer the question. MS. SHUMATE: Do you know who the f[e]male was? A. I'm not exactly sure of the name right now. I haven't reviewed the file in a long time, but I know that she lived in the same apartment with Mr. Scott. MR. HINSON: I object to that, Your Honor. No name and it's just — THE COURT: Overrule the motion. Overrule the objection. Q. And you made purchases from her as well? A. Yes. Q. In the front yard of that same apartment? A. I did. MS. SHU-MATE: Nothing further." Scott subsequently moved for a mistrial with respect to the foregoing portion of Deal's testimony, and the trial court overruled the motion.

On direct examination of Scott, he admitted that he lived with a 26-year-old woman, but said that she did not sell drugs.

On appeal Scott argues that the "only conceivable purpose and the clear and unavoidable effect" of Deal's testimony that he had made a case in the front yard of Scott's apartment with a woman who lived with him "was to attempt to further incriminate and convict Defendant by allegation of association with other persons who sell drugs." He asserts that that testimony "not only wrongfully raises the issue of Defendant's character, but relies on the suggestion of guilt by association" through "an apparently unconnected crime by another person."

The state replies that the testimony in question described Deal's "familiarity with the apartment and with the appellant's girlfriend," and was "relevant and material to an issue which the appellant himself raised at trial — i.e., the reliability of Deal's identification of him and description of the location of these events. When the officer's testimony was thus attacked, the state was entitled to prove his knowledge of the facts to which he testified and the basis of that knowledge."

We find, as Scott contends, that the testimony did place his char-

acter in issue, since it tended to impugn Scott's character and establish his guilt by association. See *Johnson v. State*, 202 Ga. App. 590 (415 SE2d 189) (1992) (state cross-examined defendant whether his companion had been convicted of selling cocaine); *Hill v. State*, 176 Ga. App. 509, 510 (336 SE2d 276) (1985) (state cross-examined defendant whether other members of his family had "been in trouble for marijuana"). Compare with *Shields v. State*, 203 Ga. App. 538 (1) (417 SE2d 168) (1992) (testimony that defendant was "associate" of person from whom officer had purchased stolen property and controlled substances did not necessarily impugn defendant's character); *Tinch v. State*, 170 Ga. App. 714 (318 SE2d 505) (1984) (testimony that officer had seen defendant and co-defendant together before did not place defendant's character in issue).

However, we also find, as the state contends, that the testimony in question was relevant to the issues Scott himself had raised. See Division 1 (a), supra. It was therefore admissible, even though it incidentally impugned Scott's character. *Rhodes*, supra, 200 Ga. App. at 197-198 (5); *Miller*, supra, 163 Ga. App. at 890-891 (3).

3. In his third enumeration of error Scott contends that the evidence was insufficient to sustain the verdict. However, construing the evidence in the light most favorable to the verdict, we hold that a rational trier of fact could have found Scott guilty beyond a reasonable doubt of the crimes charged. *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

*Judgment affirmed. McMurray, P. J., and Cooper, J., concur.*

DECIDED JANUARY 22, 1993 —
RECONSIDERATION DENIED FEBRUARY 1, 1993 —

*Sinnreich & Francisco, Elizabeth R. Francisco*, for appellant.
*Willis B. Sparks III, District Attorney, Kimberly S. Shumate, Assistant District Attorney*, for appellee.